**Keith Ketterling,** OSB No. 913368
Email: kketterling@stollberne.com
**Lydia Anderson-Dana,** OSB No. 166167
Email: landersondana@stollberne.com
**Elizabeth B. Kinsman**, OSB No. 172956
Email: ekinsman@stollberne.com
**Anuj Shah,** OSB No. 243717
Email: ashah@stollberne.com
**Chloe Jasper**, OSB No. 253957
Email: cjasper@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile:  (503) 227-6840

Attorneys for Plaintiff City of Newport

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CITY OF NEWPORT,<br><br>    Plaintiff,<br><br>    v.<br><br>KRISTI NOEM in her official capacity as the Secretary of Homeland Security, TODD LYONS, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement, ADMIRAL KEVIN LUNDAY, in his official capacity as Acting Commandant of the United States Coast Guard, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, an agency of the United | Case No. 6:25-cv-2396<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

PAGE 1 -  **COMPLAINT**

States Department of Homeland Security,
and UNITED STATES COAST GUARD, an
agency of the United States Department of
Homeland Security,

        Defendants.

## INTRODUCTION

1.      Newport, Oregon is a small coastal town with vibrant fishing, tourism, and research industries.  The community shares a deep respect for and desire to protect the natural environment, local norms, and residents and tourists.  Newport's economy, local jobs, and tax revenue depend on tourists, who visit year-round to recreate along Newport's coastline.

2.      Home to approximately 10,000 residents, Newport maintains public infrastructure that is consistent with a small yet active town.  Its airport primarily serves aviation hobbyists and small charter flights.  Many of Newport's roads are two lanes, designed to accommodate the modest flow of traffic.

3.      Newport is also home to a unique climate, including rugged terrain, chilling ocean water conditions, treacherous waves, high winds, and heavy rain.

4.      Local and state codes and regulations have been carefully crafted to maintain Newport's coastal infrastructure, protect its natural environment, and safeguard residents and visitors from floodplain and high-risk tsunami areas.

5.      With complete disregard for the foregoing, and without providing any opportunity for input from the public, Defendants have decided to fund, construct, and maintain a massive immigration detention and deportation facility in Newport (referred to herein as the "detention facility").  All indications point toward Defendants' plans to use the facility both to quickly deport a high volume of people and detain others long term.

PAGE 2 - **COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

6.      Notwithstanding the significant impacts of their plans for Newport, Defendants have kept their decision-making process and actions from public view.  They have acted rapidly to implement this decision, without regard for the law or statutorily required procedures, and without consideration of the effects a detention facility will have on Newport's environment, public infrastructure, or community.

7.      Defendants' actions also contravene their contractual obligations to the City of Newport.  In 1992, the City of Newport granted the U.S. Government a conditional interest in a parcel of property at the Newport Municipal Airport for the purpose of Coast Guard aviation. Defendants' recent actions, however, have unequivocally shown that they intend to convert the property into an ICE detention facility.

8.      As set forth herein, Defendants' hasty decision to build a detention facility in Newport—currently being implemented in secret, outside the legally mandated procedures— contravenes federal and local law and must be halted.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201(a), and pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

10.      Venue is proper in the Eugene Division of the District of Oregon pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1), and LR 3-2(a)(3).  Defendants are agencies of the United States and officers sued in their respective official capacities.  The City of Newport is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the Eugene Division.

PAGE 3 - **COMPLAINT**

## PARTIES

11.     Plaintiff the City of Newport (the "City" or "Newport") is an incorporated city on Oregon's central coast.

12.     Defendant Kristi Noem is the Secretary of Homeland Security and the head of the U.S. Department of Homeland Security.  She is sued in her official capacity.

13.     Defendant Todd Lyons is the Acting Director of Immigration and Customs Enforcement (ICE).  He is sued in his official capacity.

14.     Defendant Admiral Kevin Lunday is the acting Commandant and head of the United States Coast Guard ("Coast Guard").  He is sued in his official capacity.

15.     Defendant the United States Department of Homeland Security (DHS) is a department of the Executive Branch of the U.S. Government.  DHS is a federal agency within the meaning of the Administrative Procedures Act ("APA"), 5 U.S.C. § 551(1).

16.     Defendant ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).  ICE is under the supervision of DHS.

17.     Defendant Coast Guard is a maritime law enforcement agency.  During peacetime, the Coast Guard is an agency of DHS.  14 U.S.C. § 103(a), (b).  The Coast Guard is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

## BACKGROUND

### A.    ICE Targets Rapid Expansion As Detentions Reach Historic High

18.     In the year since President Donald J. Trump assumed his second term, the defining goal of his administration has been mass deportation.  ICE detention numbers have skyrocketed, from 39,000 in January 2025 to a projected 107,000 in January 2026.  By August

**PAGE 4 - COMPLAINT**

2025, this administration had well surpassed President Trump's first-term record for the number of ICE detainees with 61,000 people in immigration detention.[1]

19.    To execute this rapid expansion and enable its continued rise, DHS has targeted a number of nontraditional options to house the historic numbers of detainees.  These include reopening shuttered prisons in remote areas;[2] re-purposing military bases and Coast Guard facilities as detention centers;[3] and funneling detainees into foreign prisons, including the infamous mega-prison in El Salvador and others in South Sudan and Guantanamo Bay.[4]

20.    As recently reported by national news outlets, ICE is also turning to the use of soft-sided tents to increase detention beds faster than the government can build new facilities.[5]

**B.    "The Friendliest City" on Oregon's Central Coast**

21.    Newport, Oregon is a vibrant coastal town that acts as a hub for fishing, tourism, and marine research.  With just over 10,000 residents, Newport is known locally as "The Friendliest City."

---

[1] Muzaffar Chishti and Valerie Lacarte, *U.S. Immigrant Detention Grows to Record Heights under Trump Administration*, Migration Policy Institute (Oct. 29, 2025), https://www.migrationpolicy.org/article/trump-immigrant-detention.

[2] Meg Anderson, *ICE is reopening shuttered prisons as detention centers. Many have a troubled past*, National Public Radio (NPR) (Dec. 18, 2025), https://www.npr.org/2025/12/15/nx-s1-5591459/former-prison-ice-detention-centers-conditions.

[3] Benjamin J. Hulac, *Congress moves to get details about ICE use of military bases*, NJ Spotlight News (Dec. 9, 2025), https://www.njspotlightnews.org/2025/12/congress-moves-to-get-details-about-ice-use-of-military-bases/.

[4] From Texas to South Sudan: ICE's deportation pipeline, CBS News (July 30, 2025), https://www.youtube.com/watch?v=o5LQ4nKGIrg; Inside the El Salvador mega prison holding US deportees, Reuters (Apr. 16, 2025), https://www.youtube.com/watch?v=tUirc1zJ398.

[5] Fola Akinnibi et al., *ICE Plans Detention Expansion With Deal to Design 'Mega Centers,'* Bloomberg (Dec. 19, 2025), https://www.bloomberg.com/news/articles/2025-12-18/ice-plans-to-greatly-expand-detention-capacity; *US races to build migrant tent camps after $45 billion funding boost, WSJ reports*, Reuters (July 19, 2025), https://www.reuters.com/world/us/us-races-build-migrant-tent-camps-after-45-billion-funding-boost-wsj-reports-2025-07-19/.

PAGE 5 - **COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

22.    Newport is adjacent to the Pacific Ocean coastline.  Residents and tourists regularly experience chilling ocean water conditions, treacherous waves, high winds, and heavy rain.

23.    Still, throughout the year, local and out-of-state tourists enjoy fishing, surfing, hiking, and mountain biking on and along the Pacific Coast in Newport.

24.    With Newport's unique waterfront serving as a social space, visitors support the hospitality industry and shop in locally owned stores and galleries.  They enjoy fresh-caught seafood prepared in local restaurants and purchased from Newport grocery stores.

25.    Newport is also a marine science hub, with research vessels and experts from the National Oceanic and Atmospheric Administration (NOAA) and the Hatfield Marine Science Center regularly taking off from Newport's coast to study whales, sea lions, and other marine life.  This research supports the Oregon Coast Aquarium, named as one of the top 10 aquariums in the country.

### C.    The Coast Guard's Rescue Helicopter in Newport

26.    Since 1987, the Coast Guard has kept a rescue helicopter at the Coast Guard Air Facility, a 3.5-acre property within the grounds of the Newport Municipal Airport (the "Airport").  The 3.5-acre Coast Guard property is commonly referred to as "AIRFAC Newport." The Coast Guard helicopter came to Newport following the tragic sinking of a fishing vessel that left three dead.[6]

---

[6] Conrad Wilson, Michelle Wiley, and Dirk VanderHart, *Newport residents, leaders denounce possible ICE detention facility*, Oregon Public Broadcasting (Nov. 13, 2025), https://www.opb.org/article/2025/11/12/newport-residents-leaders-denounce-possible-icedetention-facility/.

PAGE 6 - **COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

27.     The helicopter hangar, apron, and refueling station occupy much of AIRFAC Newport.  The ground has parcels of concrete and grass, and the weather is regularly windy and rainy.

28.     The rescue helicopter serves as a critical lifeline for Newport.  The City's location, adjacent to the unpredictable, treacherous Pacific Ocean conditions and rugged terrain, makes the helicopter a necessity for those working in or visiting Newport's coastline.

29.     Because Newport does not have the funding or resources necessary to purchase and maintain a rescue helicopter, the City relies on the Coast Guard's rescue helicopter for search and rescue missions.

30.     On September 10, 1992, the City granted and conveyed to the U.S. Government the AIRFAC Newport site in fee simple by way of a General Warranty Deed (the "AIRFAC Deed").

31.     The AIRFAC Deed is dependent on the U.S. Government using the AIRFAC Newport property "for the primary purpose of a United States Coast Guard aviation facility." Paragraph 4 of the AIRFAC Deed states:

4.      The grantee's interest conveyed by this instrument shall revert to the grantor one (1) year after the grantee ceases to use the subject premises for the primary purpose of a United States Coast Guard aviation facility.  All improvements and fixtures installed or added by the GOVERNMENT to this land are the property of the GOVERNMENT except as provided herein.  Upon GOVERNMENT's discontinuance of its use of the real property for Coast Guard purposes, the GOVERNMENT may elect to remove any or all of its improvements in accordance with the Federal Property and Administrative Services Act of 1949 as amended, or the comparable Federal statues then in effect.  If the GOVERNMENT elects not to remove the improvements within three hundred sixty days (360) from the date of discontinuance of its use, title to all improvements shall then automatically transfer to and be vested to the DONOR.

PAGE 7 - **COMPLAINT**

32.    Therefore, the U.S. Government's interest in AIRFAC Newport shall revert to the City one year after the U.S. Government ceases using AIRFAC Newport "for the primary purpose of" a Coast Guard aviation facility.  The U.S. Government ceased using AIRFAC Newport for a rescue helicopter in May 2025.  *See* Opinion & Order at 20, *Newport Fishermen's Wives, Inc. et al. v. U.S. Coast Guard et al.,* 6:25-cv-02165-AA (Dec. 22, 2025), ECF No. 59. Thus, regardless of the fact that the U.S. Government has been compelled to place a rescue helicopter at AIRFAC Newport, it first ceased using it as aviation rescue facility in May of 2025, and the U.S. Government's interest reverts back to the City no later than May 2026, or earlier.

### D.    The Coastal Zone Management Act

33.    In 1972, Congress passed the Coastal Zone Management Act ("CZMA"), pursuant to which federal agencies and federal contractors must comply with a state's approved coastal zone management program.  In 1977, the Secretary of Commerce approved the Oregon Coastal Management Program ("OCMP"), which provides the overarching framework of state and local laws, policies and regulations for Oregon's coastal zone management.  ORS 196.425(1).

34.    The OCMP strives to conserve and protect Oregon's outstanding coastal resources by assisting local governments to develop livable, resilient coastal communities and knit together the programs and activities of local, state, and federal agencies on the Oregon coast.

35.    The entire City of Newport resides within Oregon's coastal zone and is subject to the OCMP.

36.    Oregon's Department of Land Conservation and Development ("DLCD") reviews city plans and municipal codes and incorporates policies that support OCMP goals into the OCMP.  DLCD most recently did so for the City of Newport in 2015.

PAGE 8 - **COMPLAINT**

37.    In 2015, DLCD incorporated the then-current City of Newport Comprehensive Plan ("NCP") as well as Title XIII, Land Division, and Title XIV, Zoning of the Newport Municipal Code into the OCMP.  In so doing, DLCD incorporated into the OCMP a number of city ordinances and policies that are relevant to this action.

38.    Specifically, DLCD incorporated provisions from the Newport Municipal Code ("NMC") regarding (a) "Flood Hazard Areas," which govern requirements for building and development permits in these areas and specify construction requirements for reducing flood hazard risk in these areas (NMC 14.20); and (b) the "Airport Restricted Area," including provisions that regulate uses and activities in the Airport Restricted Area, specify height limitations for structures in the Airport Restricted Area, prohibit any use resulting in aviation hazards in the Airport Restricted Area, and delineate other zones within the Airport Restricted Area that further restrict the nature and extent of permissible development (NMC 14.22).[7]

39.    The CZMA requires that federal agency actions that affect any use or resource of the state's coastal zone are consistent to the maximum extent practicable with the federally approved enforceable policies of a state's coastal management program.  16 U.S.C. § 1456(c).

40.    Under the CZMA, a federal agency carrying out an activity in a coastal zone is required to provide the state with a consistency determination no later than 90 days before the final approval of the activity, unless "the Federal agency and the State agency agree to a different schedule."  16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.36(b).

---

[7] Herein, references to NMC 14.20, NMC 14.22, "Flood Hazard Areas," and the "Airport Restricted Area" concern the 2015 Newport Municipal Code.  All other citations to the Newport Municipal Code pertain to its current version, unless otherwise specified.

PAGE 9 - **COMPLAINT**

41.     The federal agency's consistency determination includes whether an action has "reasonably foreseeable direct and indirect effects on any coastal use or resource." 15 C.F.R. § 930.33.  An "effect on any coastal use or resource" means "any reasonably foreseeable effect on any coastal use" resulting from a federal action, and includes direct and indirect effects which result from the activity at the same time as the action as well as at a later time.  15 C.F.R. § 930.11(g).  Coastal uses that the federal agency must consider in its consistency determination include recreational activities, fishing, and floodplain management.  15 C.F.R. § 930.11(b).

**E.     The National Environmental Policy Act**

42.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, requires federal agencies undertaking major federal action to assess the environmental effects of the proposed action and identify feasible alternatives prior to acting.  NEPA ensures both that (a) federal agencies take a hard look at the environmental effects of a proposed action before the agency can decide to proceed, and (b) the public is aware of the environmental consequences of a federal agency's course of action before the agency acts.

43.     In accordance with NEPA, federal agencies must prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment.  The EIS is subject to rigorous requirements, including a mandatory notice and comment period, and must address, among other factors, any reasonably foreseeable environmental effects of the proposed action and a reasonable range of alternatives.

44.     Alternatively, if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effects are unknown, federal agencies must prepare an Environmental Assessment (EA).  The EA must discuss, among

PAGE 10 - **COMPLAINT**

other things, the need for the proposed action, reasonable alternatives, and environmental effects of the action and alternatives.

45.    The federal government must prepare the EIS or EA **before** it takes final action.

46.    The NCP and NMC include environmental provisions that highlight some of the foreseeable environmental effects of Defendants' planned ICE detention facility.  These include:

(a) **NMC 14.45.010**, requiring a Traffic Impact Analysis ("TIA") be submitted to the City with a land use application where a proposal may "generate 50 PM peak-hour trips or more onto city streets or county roads," or "increase use of any adjacent street by 10 vehicles or more per day that exceeds 26,000 pound gross vehicle weight";

(b) **NMC 14.45.020**, requiring that an applicant "meet with the City Engineer prior to submitting an application that requires a Traffic Impact Analysis," and include the Oregon Department of Transportation ("ODOT") in that meeting "when an approach road to US-101 or US-20 serves the property," so that the completed TIA meets both City and ODOT requirements; and

(c) **NMC 14.50**, creating the XXL tsunami inundation area overlay in Newport's high-risk tsunami areas and, in those areas, limiting certain uses, imposing tsunami resilient building code requirements for high-risk structures, and prohibiting certain facilities in the tsunami hazards overlay zone, including jails and detention facilities.

47.    The environmental provisions of the NCP and NMC reflect that, in Newport, analyzing the reasonably foreseeable environmental effects of a planned ICE detention facility pursuant to NEPA would include, at minimum, analysis of the City's coastal zone policies; the City's location in an high-risk tsunami area; impacts to the floodplain areas, including Highway 101; impacts to traffic, including on Highway 101; consequences for threatened and endangered

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

species in Newport's varied habitats; impacts on Yaquina Bay (listed by the Environmental

Protection Agency as an impaired waterbody); and others.

## GENERAL ALLEGATIONS

**A.    Defendants intend to build an ICE detention facility in Newport.**

48.    Upon information and belief, Defendants have decided to build and maintain an

ICE detention facility in Newport.  Specifically, Defendants will convert AIRFAC Newport[8] into

an ICE detention facility, using Newport's Airport and Port access to make Newport a remote

black site for detention, processing, and rapid deportation.

49.    In October 2025, Coast Guard personnel began removing Newport's Coast Guard

rescue helicopter operations from AIRFAC Newport and clearing out Coast Guard equipment

from the property.  At the same time, federal contractors began inundating local businesses,

including hotels, a catering company, and utility entities, with inquiries about providing services

for a facility containing over 200 people.  A major federal contractor began posting daily job

openings in Newport for a variety of roles, seeking "DHS or ICE detention center experience."

50.    These events and others described herein make clear that Defendants plan to build

an illegal detention facility in Newport, without following any of the statutorily mandated

procedures, without regard for their contractual obligations, and in violation of federal law.

> 1.    Highly unusual activity at the Airport and Coast Guard facility reflects
> Defendants' decision to use AIRFAC Newport as an ICE detention facility.

51.    The Newport Airport is a small, nontowered airport that primarily supports small

private charter flights for aviation hobbyists and tourists.  The Airport sees low traffic, with

around 10 flights per day in the winter, and up to 50 flights per day in the summer high season.

---

[8] Upon information and belief, Defendants may target other properties in Newport, including a
privately leased 10-acre parcel on Airport property, as well as properties in the Port of Newport.

PAGE 12 - **COMPLAINT**

52.     In October 2025, Coast Guard personnel began removing equipment from the AIRFAC Newport helicopter hangar and Airport property, including the tug used to transport the Coast Guard helicopter and an Airstar heater.

53.     On October 31, 2025, approximately 40 federal government employees and contractors in blue uniforms convened at the Airport to discuss plans for AIRFAC Newport. This level of activity was unusual for the Airport.

54.     One attendee told the Airport Director that the meeting was for a "deportation center."

55.     Upon information and belief, the October 31 meeting included a tour of the 3.5-acre AIRFAC Newport property and discussion about converting the property to an ICE detention facility.

56.     One news outlet reported that, during the meeting, contractors asked ICE officials how they intended to satisfy the agency's own National Detention Standards for 200 detainees, given how little space was available around and within AIRFAC Newport.  ICE officials responded that they plan to waive certain requirements to "keep the project on track."[9]

57.     Upon information and belief, ICE officials also stated that they would detain people for less than 72 hours to avoid triggering heightened standards of care; however, they acknowledged that some people may be detained for up to 10 days.

58.     That same news outlet reported that ICE officials suggested soft-sided tents would be acceptable for housing people in immigration detention.  This is despite the gale-force winds, heavy rainfall, and near-freezing temperatures that Newport experiences in the winter.

---

[9] Taylor Giorno and Jackie Llanos, *ICE Wants to Build an Oregon Detention Facility. Contractors Say Construction Plans Are Alarming.*, NOTUS (Dec. 10, 2025), https://www.notus.org/immigration/ice-oregon-detention-facility-detainees-coast-guard.

PAGE 13 - **COMPLAINT**

59.     During this meeting, a Texas-based plane landed at the Airport, and refueled approximately 1,000 gallons.  Upon information and belief, the plane belonged to Team Housing Solutions ("THS"), a Texas-based federal contractor that specializes in temporary lodging services.

60.     Soon after the October 31 meeting, the Coast Guard began to prepare for ICE's takeover of AIRFAC Newport.  By way of example, U.S. Coast Guard Captain Kent Reinhold testified at a recent deposition about internal meetings in early November 2025 about the conversion of AIRFAC Newport into an ICE facility.

2.      Federal contractor inquiries make clear that Defendants have decided to build an ICE detention facility in Newport.

61.     In October 2025, federal contractors began initiating the groundwork to carry out ICE's plans for Newport.

a.      *Airport Property Inquiries*

62.     On November 4, 2025, THS sent a letter of intent to the City of Newport seeking a minimum six-month lease for a 4.3-acre parcel of land owned by the City at the Airport.  The letter stated that THS intended "to utilize the Property to support federal operations" and would commence on or around December 1, 2025.  The 4.3-acre parcel is immediately adjacent to the Coast Guard's 3.5-acre property.

63.     In the letter, THS stated that it would use the 4.3-acre parcel for "[e]quipment and vehicle parking"; "[o]perational staging in support of the federal project"; "[p]lacement of temporary facilities, including mobile office trailers and storage containers"; "[u]se of generators and related utility infrastructure"; and "[i]nstallation of a 12-foot security fence around the leased area for controlled access."  THS subsequently withdrew its letter of intent.

PAGE 14 - **COMPLAINT**

64.     Federal contractors also began investigating another plot of land at the airport. Signal Ventures, LLC leases 10.73 acres of land from the City at the Airport (the "Signal Venture Property"). The Signal Ventures Property is within the Airport boundary near AIRFAC Newport.

65.     Signal Ventures received two inquiries from government contractors interested in the Signal Ventures Property. Upon information and belief, the contractors told Signal Ventures they would be conducting "temporary staging" on the property related to Coast Guard "improvements."

66.     Below is a map outlining the approximate locations and sizes of the City-owned property leased to Signal Ventures (yellow), AIRFAC Newport (orange), and the City's 4.3 acre property (green).



PAGE 15 - **COMPLAINT**

b.    *Wastewater and Other Utility Inquiries*

67.    Several more contractor inquiries emerged across Newport. Upon information and belief, on November 7, 2025, one contractor told T & L Septic (a septic company located in Lincoln City, Oregon) that the contractor planned to install temporary housing and trailers at the Airport. In support of that project, the contractor needed 30,000 gallons of wastewater pumped out of holding tanks every week.

68.    Upon information and belief, Acuity International, a Virginia-based professional services provider, also contacted T & L Septic in early November regarding "a federal project in Newport." Acuity requested sewage pumping from a holding tank at a rate of 5,000 to 10,000 gallons per day for up to 3 years, as well as portable toilets and handwashing stations. Upon learning of the inquiry, Newport's Public Works Department explained that its aging infrastructure could not handle that level of demand.

69.    Similar requests came to the Newport Public Works Department. On or around December 15, 2025, EquipmentShare, a Missouri-based company specializing in construction equipment rental and sales, asked for sewage disposal via vacuum truck for a "full-service temporary hotel" in Newport beginning in January 2026. EquipmentShare reported that it anticipated a daily volume of 80 to 130 gallons from portable toilets, and 9,600 to 15,600 gallons from "hotel" functions such as laundry and dishwashing.

70.    Upon information and belief, that same day, a company called CCS contacted the Eugene Public Works Department to inquire about hauling wastewater for a project in Newport. CCS relayed that it would begin with hauling 15,000 gallons of wastewater per day and ramp up to 30,000 gallons per day.

**PAGE 16 - COMPLAINT**

71.     Contractors also sought potable water delivery and trash removal.  Upon information and belief, on or around November 25, 2025, THS contacted Thompson's Sanitary Service, a Newport-based waste and recycling service provider, requesting quotes for up to 11,000 gallons of potable water per day for a minimum of 30 days and up to 6 months, and regular trash hauling services.

72.     Upon information and belief, USA Up Star, LLC, an Indiana-based company specializing in full-service base camps, also contacted Thompson's Sanitary Service in November 2025.  USA Up Star, LLC, requested a quote for servicing of three 30-yard waste drop boxes and the delivery of 30 gallons of potable water per day.

73.     Upon information and belief, in early December, Water Wagon, LLC, a potable water provider operating in the Pacific Northwest, contacted a coastal water district to find a local partner for the delivery of 55 gallons of potable water twice per day to the Airport.

c.     *Food Delivery Inquiries*

74.     Upon information and belief, on November 21, 2025, Deployed Resources, LLC ("Deployed Resources"), a New York-based company that specializes in temporary facilities and logistical management, contacted a Newport catering company to request a quote for 215 people per meal, three meals per day, with pickups scheduled at 4:30 am and 10:30 am each day. Deployed Resources contacted the company again on December 1, 2025, saying that it needed pricing information by December 3, 2025.

75.     Deployed Resources stated that breakfast and lunch would be served hot, and dinner could be served cold.  Deployed Resources also stated that most meals would be vegetarian and that they would need some gluten-free options.

PAGE 17 **- COMPLAINT**

76.    Under ICE's National Detention Standards, people in immigration detention must receive three meals per day, at least two of which must be hot.  ICE must also provide a common-fare menu that does not contain meat to accommodate for religious practices.

### d.    *Lodging Inquiries for Federal Employees and Contractors*

77.    Upon information and belief, in late November, THS contacted a Newport hotel by phone and email to ask whether the hotel could provide 200 rooms beginning on December 15, 2025, for up to one year.  THS indicated that it was looking for rates of $67 to $99 per room per night, with two beds in each room.  Upon information and belief, THS contacted two other hotels in Newport with the same request in late November.

78.    Upon information and belief, THS contacted two more Newport hotels in December, both times requesting 15 rooms for one year beginning on December 15, 2025.

79.    Upon information and belief, THS contacted two Yachats-based hotels in December to request quotes for housing a large group of staff for the entirety of 2026.

80.    One news outlet reported that federal contractors had a mid-December deadline to submit proposals and pricing to ICE for the Newport detention facility.  This timing is corroborated by the repeated inquiries of federal contractors in mid-November and early December for quotes by early December or "within two weeks."

### 3.    One federal contractor has posted over a dozen job advertisements in Newport seeking ICE experience.

81.    In mid-November, Acuity began advertising over a dozen health services positions stationed in Newport.  Acuity posted open positions for a registered nurse, nurse manager, certified medical assistant, psychiatric nurse practitioner, referral coordinator, physician assistant, physician, medical records technician, infection prevention officer, health

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

services administrator, clinical director, medical assistant, behavioral health specialist, and behavioral health technician.

82.     All of these job postings listed "DHS or ICE detention center experience" as a preferred qualification.

83.     Acuity also advertised positions in Newport that listed duties specific to DHS's detention and deportation operations, including an administrative assistant for the medical team within an ICE facility; a case processing specialist who would coordinate with ICE officers on immigration hearings and removals; and a case management supervisor who would oversee the processing of detainee case files.

**B.     Newport's infrastructure, community, and economy are not designed to accommodate an ICE detention facility, and Newport will be harmed as a result.**

84.     Critical components of Newport's infrastructure, community, and economy will be harmed by Defendants' detention facility, including the Airport, Highway 101, the City's wastewater treatment facility, and Newport's economy.

       1.     Newport's Airport is designed to support a town of 10,000, not a detention facility.

85.     The Airport has implemented multiple safeguards to account for its modest size, equipment, relatively isolated location, and surrounding environment and wildlife.

86.     The Airport previously maintained a Part 139 certification from the Federal Aviation Administration (the "FAA"), which allowed it to serve aircraft carrying more than 9 passengers.  However, the Airport voluntarily surrendered its Part 139 certification after determining that its two runways were too short to satisfy FAA safety requirements for higher-capacity aircrafts.  As a result, the Airport cannot serve publicly ticketed air carriers with more than 9 passengers.

PAGE 19 - **COMPLAINT**

87.     The Airport's primary airstrip, the only airstrip at the Airport rated to accommodate heavier moderate- or high-capacity aircraft, is not long enough to allow a larger aircraft to take off and re-land in an emergency because a vast 80- to 90-foot ravine borders the runway at its south end.  The ravine also makes lengthening the runway nearly impossible.

88.     Furthermore, the Airport's aprons (which serve as staging areas for the parking, maintenance, and refueling of planes) are unable to handle the weight and amount of traffic of more frequent and heavier traffic.

89.     The Airport also has two secure gates to access aircraft apron areas, which provide access for privately owned hangars.

90.     One of the Airport's secure gates is less than 52 yards from AIRFAC Newport and occupies a shared drive aisle.  Increased vehicle traffic would significantly impact airport tenants and potentially increase vehicle accidents and incidents that compromise the safety of airfield tenants.

91.     The presence of wildlife, including elk and coyotes, inhabiting the area surrounding the Airport requires precautionary measures.  The Airport maintains a secure fence around its runways to mitigate the risk of wildlife coming onto the runway.  However, the Airport does not have sufficient staff to ensure orderly entry and exit for any increase in traffic.

92.     Increased airplane and vehicle access risks hazardous conditions for aircrafts landing at or taking off from the Airport and increases the risk of wildlife entering through an open gate, resulting in aircraft damage and possible loss of life.

93.     Taking together the Airport's capacity, equipment, runways, and surrounding environment, the Airport cannot safely accommodate the increased number of flights, larger jets, or increased traffic that would inevitably result from Defendants operating an ICE detention

PAGE 20 - **COMPLAINT**

facility on Airport property.  The impacts on the Airport will cause irreparable harm that cannot be remedied by money damages.

    2. <u>The Airport's sole access road is subject to flooding and tsunami risk and is zoned accordingly.</u>

  94. Highway 101, the only access road to the Airport, is within Newport's XXL tsunami inundation area overlay and is therefore subject to flooding and tsunami risk.  The XXL tsunami inundation area overlay, codified at NMC 14.50, restricts Highway 101's uses, implicates building requirements, and places prohibitions on the presence of certain facilities.[10]

  95. In the event of a nearshore Cascadia Subduction Zone earthquake, people in Newport's high-risk tsunami areas will have no more than 30 minutes to evacuate to higher ground before devastating tsunamis strike.

  96. Defendants' decision to construct, maintain, and fund the ICE detention facility in Newport, without regard for the XXL tsunami inundation area overlay , will irreparably harm Newport and compromise the community's safety.  These impacts cannot be remedied by money damages.

    3. <u>Newport's aging wastewater treatment infrastructure is sensitive to any rapid increase in demand, particularly from hauled wastewater.</u>

  97. Newport's Public Works Department (the "Department") maintains infrastructure for wastewater treatment through established underground sewer lines.

---

[10] To the extent that Defendants aim to develop a detention facility on any property at the Port of Newport—including Oregon State University's Hatfield Marine Science Research Center, the NOAA Marine Operations Center, or the site of the former Rogue Ale Brewery—the Port of Newport is entirely within the tsunami hazards overlay zone and is therefore subject to associated development requirements and restrictions.  Moreover, most of the property under the jurisdiction of the Port of Newport is classified as shoreland areas under the NMC.  As such, zoning in these areas is limited to water-dependent and water-related uses.  NMC 14.03.080. Neither water-dependent nor water-related zoning would permit an ICE detention or deportation facility.

PAGE 21 **- COMPLAINT**

98.     The Department can also process wastewater that is hauled in holding tanks to the wastewater treatment facility.  However, aging sewer infrastructure limits the Department's capacity to process hauled wastewater.

99.     Hauled waste from portable toilets poses an additional burden on the Department, because it is chemically treated and requires additional steps to process.

100.    The Department's treatment plant currently receives approximately 36,500 gallons of hauled wastewater per month.

101.    Processing an additional 30,000 gallons of hauled wastewater per week would severely strain the City's treatment infrastructure.

102.    Neither AIRFAC Newport nor the Signal Ventures property are connected to Newport sewer lines.  Therefore, wastewater from a detention facility built at the Airport would need to be hauled to a treatment plant for processing.

103.    The Department is unable to safely or feasibly accommodate the volume of hauled wastewater implicated by Defendants' ICE detention facility.

104.    The presence of and transportation for this increased volume of wastewater in and around Newport, which Defendants intend to impose without considering the environmental impacts, will irreparably harm the City in a manner that cannot be remedied by money damages.

4.    <u>The City's local economy and tax revenue are impacted by the construction and maintenance of Defendants' detention facility in Newport.</u>

105.    Tourism is a major sector of Newport's economy.  In 2024 alone, tourism generated $110 million in revenue in Newport.

106.    Tourism supports local jobs in the hospitality industry, restaurants (which serve locally harvested seafood), artists, and other small businesses.  The wellbeing of Newport's residents and economy depend, in large part, on revenue received from tourism.

PAGE 22 - **COMPLAINT**

107.    The City also depends on tax revenue generated from tourism.  A local lodging tax of 12 percent applies to any short-term lodging up to 30 days.  The tax does not apply to federal employees and would not apply to contractors who stay in excess of 30 days.

108.    In addition, federal government employees and contractors often receive highly discounted government rates, usually at a fraction of the cost afforded to the general public.

109.    Defendants intend to book hundreds of hotel rooms at highly discounted rates in Newport.  This would prevent tourists from being able to stay in Newport—tourists who would both pay higher rates for rooms and be subject to the City's local lodging tax.  Because Newport's lodging tax does not apply to federal employees or contractors who stay for longer than 30 days, Newport will lose significant tax revenue.

110.    The presence of hundreds of Defendants' employees and contractors will also chill tourism at Newport local businesses, impact Newport's reputation with in-state and out-of-state visitors, and deter hobbyists and tourists from using the Airport.

111.    Defendants' increased presence in Newport will irreparably harm the local economy, job sector, and the City's tax revenue, in a manner that cannot be remedied by monetary damages.

**C.    Defendants' decision to convert AIRFAC Newport into an ICE detention facility violates the CZMA.**

112.    Defendants have decided to construct an ICE detention facility without any regard for the requirements in the CZMA, OCMP, or applicable provisions of the NMC.

113.    Defendants' decision to convert AIRFAC Newport into an ICE detention facility and house up to 200 detainees at any given time will significantly increase wastewater, trash, transportation, and traffic at the site.  Those impacts will have a reasonably foreseeable effect on coastal uses, including recreational activities, fishing, and floodplain management.

PAGE 23 **- COMPLAINT**

114.    By way of example, Defendants and their contractors have stated that the ICE detention facility will generate up to 30,000 gallons of wastewater per day, which will need to be hauled from the site on a regular basis.  Defendants' decision to construct and maintain the ICE detention facility in Newport also implicates Flood Hazard Area and Airport Restricted Area provisions of the NMC, including building or development permits and restrictions found in the Airport Restricted Area of the NMC.

115.    Nonetheless, upon information and belief, Defendants have not provided the State with any consistency determination for the ICE detention facility.  Thus, the 90-day waiting period contemplated by the CZMA has not started.

116.    Upon information and belief, the State of Oregon has not agreed to receive a consistency determination regarding the ICE detention facility in fewer than 90 days before final approval of the ICE detention facility.

117.    Because Defendants have not yet provided a consistency determination regarding that ICE facility, the State of Oregon has not yet provided the public notice required by 16 U.S.C. § 1456(c)(3)(A) for an ICE detention facility in Newport.

118.    Given that Defendants cannot satisfy the CZMA's requirement to provide 90 days' notice of their consistency determination before their planned detention of migrants at the Airport in early 2026, Defendants intend to violate the CZMA.

**D.    Defendants' decision to construct an ICE detention facility in Newport violates NEPA.**

119.    Defendants have decided to construct an ICE detention facility without assessing the facility's effects on the environment.

PAGE 24 **- COMPLAINT**

120.    Defendants' decision to construct, maintain, and fund an ICE detention facility in Newport is a major federal action, as it involves the use of federal authority, approvals, funding, and resources.

121.    Defendants' decision to construct, maintain, and fund an ICE detention facility in Newport poses environmental effects.  By way of example, Defendants and their agents intend to install housing units and tents, generate wastewater and trash, and construct or utilize large-scale sanitation systems.  The detention facility will likely also implicate high-volume vehicle transportation, diesel power generators, and alterations to the natural terrain.

122.    Additionally, the ICE detention facility implicates the City's coastal zone policies, the XXL tsunami inundation area overlay, floodplain areas, threatened and endangered species, and Yaquina Bay, among other things.

123.    Upon information and belief, Defendants have taken no steps to assess the environmental effects implicated by their ICE detention facility in Newport.

124.    Upon information and belief, neither Defendants nor any cooperating agency have prepared an Environmental Impact Statement (EIS) or Environmental Assessment (EA).

125.    Upon information and belief, Defendants have not invoked any categorical exclusion from NEPA, nor does any apply.

126.    Upon information and belief, Defendants have not invoked any exemption or waiver of NEPA requirements, and none exists.

127.    NEPA contains no exceptions for emergencies.  Therefore, no emergency exists that would warrant departure from NEPA's requirements.

128.    Defendants have not conducted, scheduled, or planned for any public notice or hearing concerning the creation of an ICE detention facility in Newport.

PAGE 25 - **COMPLAINT**

129.    Defendants' failure to conduct NEPA's required environmental review violates federal law and deprives the public and affected stakeholders, including the City, of required procedural environmental protections.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE APA**
**Action that is Contrary to Law (CZMA, 16 U.S.C. § 1456(c))**

130.    The City realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

131.    In accordance with the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with the law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (C)–(D).

132.    Defendants' decision to construct, maintain, and fund an ICE detention facility in Newport constitutes a final agency action, which is reviewable under the APA.

133.    Defendants have failed to provide a consistency determination that utilizing the Airport as an ICE detention facility is consistent to the maximum extent practicable with federally approved enforceable policies of the OCMP.

134.    Those federally approved enforceable policies include, but are not limited to, (a) NMC 14.20, which regulates development in Flood Hazard Areas; (b) NMC 14.22, which regulates development and activities in the Airport Restricted Area; and (c) Oregon's Statewide Planning Goal 19, which provides that "State and federal agencies shall carry out actions that are reasonably likely to affect ocean resources and uses of the Oregon territorial sea in such a manner as to . . . protect and encourage the beneficial uses of ocean resources – such as navigation, food production, [and] recreation."

PAGE 26 **- COMPLAINT**

135.    Defendants' utilization of the Airport as an ICE detention facility is not consistent to the maximum extent practicable with the federally approved enforceable policies of the State's coastal management program.

136.    Defendants' actions, therefore, are contrary to law in violation of the APA.

137.    The City is entitled to injunctive and declaratory relief requiring compliance with the CZMA before Defendants or their agents perform further activity on the construction, maintenance, or funding of an ICE detention facility in Newport.

## SECOND CLAIM FOR RELIEF: VIOLATION OF THE APA
## Action that is Contrary to Law (NEPA (42 U.S.C. § 4321))

138.    The City realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

139.    Defendants' decision to construct, maintain, and fund an ICE detention facility in Newport constitutes a final agency action, which is subject to judicial review under the APA.

140.    Defendants have authorized the construction, maintenance, and funding of an ICE detention facility in Newport without adhering to required environmental review procedures under NEPA and other federal laws.

141.    Defendants have not prepared an Environmental Impact Statement (EIS) or Environmental Assessment (EA) concerning the construction or maintenance of the detention facility in Newport.

142.    Defendants have not consulted with any federal agency that has jurisdiction or special expertise with respect to any environmental impact involved with construction of the ICE detention facility in Newport.

PAGE 27 - **COMPLAINT**

143.    Defendants have not provided the City or the public with an opportunity for notice and comment.

144.    Defendants' decision to construct, maintain, and fund an ICE detention facility in Newport poses environmental effects, including the generation and transportation of wastewater and trash, high-volume vehicle transportation, diesel power generators, alterations to natural terrain, impacts within tsunami hazard and floodplain areas, impacts on threatened and endangered species, and impacts on Yaquina Bay, among others.

145.    Defendants' failure to conduct NEPA's required environmental review deprives the public and affected stakeholders (including the City) of required procedures and environmental protections.  As a result, Defendants' actions are not in accordance with law under the APA.

146.    The City's environment will be impacted and harmed by Defendants' decision to build an ICE detention facility in Newport.  Therefore, the City has standing under Article III to bring suit for Defendants' failure to comply with NEPA.

147.    The City is entitled to injunctive and declaratory relief requiring compliance with NEPA before Defendants or their agents perform further activity on the construction, maintenance, and funding of an ICE detention facility in Newport.

### THIRD CLAIM FOR RELIEF: VIOLATION OF THE APA
### Agency Action that is Arbitrary and Capricious (5 U.S.C. § 706(2)(A))

148.    The City realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

149.    Defendants' construction, maintenance, and funding of an ICE detention facility in Newport is arbitrary and capricious.

PAGE 28 - **COMPLAINT**

150.    Defendants have not offered any explanation for their action, let alone "a satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (internal quotation marks and brackets omitted).

151.    The City is entitled to a declaration that Defendants' decision to construct, maintain, or fund an ICE detention facility in Newport is arbitrary and capricious.

### FOURTH CLAIM FOR RELIEF: *ULTRA VIRES* ACTION
### Violations of the CZMA and NEPA

152.    The City realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

153.    The CZMA requires Defendants to provide a consistency determination before taking federal agency action that affects any use or resource of the City's coastal zone. By failing to provide a consistency determination before authorizing the construction of an ICE detention facility, Defendants have violated the CZMA.

154.    NEPA requires that Defendants create an EIS or EA before constructing, maintaining, or funding an ICE detention facility in Newport. Because Defendants failed to prepare an EIS or EA before authorizing the construction of an ICE detention facility, Defendants have violated NEPA.

155.    Accordingly, the City is entitled to a declaration that Defendants' construction, maintenance, and funding of the ICE detention facility is invalid. The City is also entitled to injunctive relief requiring Defendants to cease developing the ICE detention facility in Newport. Absent such relief, the City will continue to be harmed by Defendants' unlawful actions.

PAGE 29 - **COMPLAINT**

## FIFTH CLAIM FOR RELIEF: BREACH OF CONTRACT
### Anticipatory Repudiation

156.    The City realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

157.    Newport's AIRFAC Deed to the U.S. Government for AIRFAC Newport is a valid, binding contract, supported by mutually exchanged consideration.

158.    The City has fully complied with, and is not in breach of, the AIRFAC Deed.

159.    Pursuant to the AIRFAC Deed, the U.S. Government shall use AIRFAC Newport "for the primary purpose of a United States Coast Guard aviation facility." The U.S. Government's interest in AIRFAC Newport shall revert to the City one year after the U.S. Government ceases using AIRFAC Newport for the primary purpose of a Coast Guard aviation facility.

160.    Defendants have shown that the U.S. Government positively, unconditionally, unequivocally, distinctly, and absolutely refuses to perform its obligation under the AIRFAC Deed to use AIRFAC Newport for the primary purpose of a Coast Guard aviation facility.

161.    By way of example, Defendants have shown this refusal by (1) removing Coast Guard equipment from AIRFAC Newport, (2) removing the Coast Guard's rescue helicopter from AIRFAC Newport, (3) holding meetings concerning the creation of the ICE detention facility at AIRFAC Newport, and (4) hiring contractors to make inquiries into and develop plans for the ICE detention facility.

162.    In fact, Defendants contested a preliminary injunction that would require the return of the Coast Guard Helicopter to Newport, and only returned it to Newport by order of the court. *See Newport Fishermen's Wives, Inc., et al. v. United States Coast Guard, et al.*, Case No. 6:25-cv-02165-AA, Dkt. 45, Defs.' Resp. to Mot. for Prelim. Inj. (Dec. 5, 2025).

PAGE 30 - **COMPLAINT**

163.    Defendants' refusal to comply with the AIRFAC Deed gives the City the right to maintain an action for breach of contract occurring from Defendants' anticipatory breach.

164.    Therefore, the City is entitled to specific performance and declaratory relief directing Defendants to use AIRFAC Newport for the primary purpose of a Coast Guard aviation facility, and prohibiting Defendants from constructing, maintaining, and funding an ICE detention facility at AIRFAC Newport.

165.    In the alternative, the City requests a declaration that the U.S. Government ceased using AIRFAC Newport as a United States Coast Guard aviation rescue facility in May of 2025; does not intend to use AIRFAC Newport for the primary purpose of a United States Coast Guard aviation facility; that the City's interest in the property shall face irreparable harm if the U.S. Government maintains its interest in AIRFAC Newport after it has evidenced its intent to no longer use the property for this primary purpose; that, due to the irreparable harm that will be caused to the property by Defendants' construction of the ICE detention facility, the U.S. Government's interest in AIRFAC Newport shall now revert to City; and that title to all improvements on the property shall automatically transfer to and be vested in the City.

### SIXTH CLAIM FOR RELIEF: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

166.    The City realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

167.    The AIRFAC Deed implies a duty of good faith and fair dealing on the parties. The purpose of the implied duty of good faith and fair dealing is to effectuate the parties' reasonable expectations.

PAGE 31 - **COMPLAINT**

168.     In accordance with the duty of good faith and fair dealing, the U.S. Government must act in an objectively reasonable manner in the performance of the AIRFAC Deed and cannot engage in any act that will destroy or injure the City's rights to receive the fruits of the contract.

169.     Defendants' decision to no longer use AIRFAC Newport for the primary purpose of a Coast Guard aviation facility, and to convert AIRFAC Newport into an ICE detention facility, is not objectively reasonable in light of the conditions imposed by the AIRFAC Deed.

170.     Defendants' construction of the detention facility at AIRFAC Newport will destroy or injure the value of the City's right to reversion under the Deed.  In particular, the construction of a detention facility (whether in the form of soft-sided tents or more permanent housing) eradicates the safety, desirability, and monetary value of the property, and erodes its environmental compliance.

171.     Accordingly, the City is entitled to a declaration discharging its obligation to wait one year for the reversion of its interest in the AIRFAC Newport and an additional year for improvements to transfer to the City, and that the U.S. Government's interest in AIRFAC Newport and all improvements thereupon shall now revert to City.

## PRAYER FOR RELIEF

WHEREFOR, the City respectfully requests the Court:

A.     Declare that Defendants' decision to construct, maintain, and fund an ICE detention facility in Newport is contrary to law and violates the CZMA, NEPA, and the APA;

B.     Declare that Defendants' decision to construct, maintain, or fund an ICE detention facility in Newport is arbitrary and capricious;

PAGE 32 - **COMPLAINT**

C.    Declare and issue injunctive relief requiring Defendants' compliance with the CZMA, NEPA, and the APA before Defendants or their agents perform further activity on the construction, maintenance, or funding of an ICE detention facility in Newport;

D.    Declare that Defendants' decision to construct, maintain, and fund an ICE detention facility is *ultra vires*;

E.    Temporarily restrain, preliminarily enjoin, and prohibit Defendants from constructing, maintaining, or funding an ICE detention facility in Newport, including all pre-construction activities, construction, or use of the Airport for migrant deportation and detention, unless and until Defendants comply with the CZMA, NEPA, and the APA;

F.    Set aside and vacate any authorization for Defendants to construct an ICE detention facility or disperse funds for the construction or maintenance of such a facility in Newport;

G.    Order specific performance and declaratory relief directing Defendants to use AIRFAC Newport for the primary purpose of a Coast Guard aviation facility, and prohibiting Defendants from constructing, maintaining, and funding an ICE detention facility at AIRFAC Newport.  In the alternative, the City requests a declaration that the U.S. Government ceased using AIRFAC Newport as a United States Coast Guard aviation rescue facility in May of 2025; does not intend to use AIRFAC Newport for the primary purpose of a United States Coast Guard aviation facility; that the City's interest in the property shall face irreparable harm if the U.S. Government maintains its interest in AIRFAC Newport after it has evidenced its intent to no longer use the property for this primary purpose; that, due to the irreparable harm that will be caused to the property by Defendants' construction of the ICE detention facility, the U.S.

PAGE 33 - **COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Government's interest in AIRFAC Newport shall now revert to City; and that title to all

improvements on the property shall automatically transfer to and be vested in the City.


DATED this 22nd day of December, 2025.


STOLL STOLL BERNE LOKTING & SHLACHTER P.C.


By: *s/ Elizabeth B. Kinsman*
  **Keith Ketterling**, OSB No. 913368
  **Lydia Anderson-Dana**, OSB No. 166167
  **Elizabeth B. Kinsman**, OSB No. 172956
  **Anuj Shah**, OSB No. 243717
  **Chloe Jasper**, OSB No. 253957
  209 SW Oak Street, Suite 500
  Portland, OR 97204
  Telephone: (503) 227-1600
  Facsimile: (503) 227-6840
  Email: kketterling@stollberne.com
     landersondana@stollberne.com
     ekinsman@stollberne.com
     ashah@stollberne.com
     cjasper@stollberne.com

  -and-

  **Tiffany Johnson**, OSB No. 151190
  City Attorney Office
  169 SW Coast Hwy
  Newport, OR 97365
  Telephone: 541-574-0607
  Email: t.johnson@newportoregon.gov

  *Attorneys for City of Newport*


**PAGE 34 - COMPLAINT**